13 CV 8094

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
ROBERT L. BROWN, on behalf of himself          :
individually and as representative of a class of    :
similarly situated individuals,                              :
                                                                          :
                                        Plaintiff,               :       Civil Action No.
                                                                          :
                        - against -                              :       **CLASS ACTION COMPLAINT**
                                                                          :
THE CITY OF NEW YORK, THE NEW YORK CITY  :
POLICE DEPARTMENT; NEW YORK CITY          :
POLICE DEPARTMENT SERGEANT LOU           :       **JURY TRIAL DEMANDED**
DEVIRGILIO; NEW YORK CITY POLICE OFFICER  :
GEORGE DROESCH and UNIDENTIFIED           :
INDIVIDUALS BELIEVED TO BE NEW YORK      :
CITY POLICE OFFICERS JOHNS DOES # 1        :
AND #2,                                                                :
                                                                          :
                                        Defendants.            :
------------------------------------------------------------ X

       Plaintiff Robert L. Brown ("Plaintiff" or "Mr. Brown"), on behalf of himself individually

and as representative of a class of similarly-situated individuals, by and through his undersigned

counsel, Thompson Wigdor LLP and Elefterakis Elefterakis & Panek, as and for his Class Action

Complaint against Defendants the City of New York ("the City"), the New York City Police

Department ("NYPD"), NYPD Sergeant Lou Devirgilio ("Devirgilio"), NYPD officer George

Droesch ("Droesch"), and Unidentified NYPD Officers John Does #1 and # 2 (collectively,

"Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

       1.       This is a civil rights action in which named Plaintiff Robert L. Brown ("Plaintiff"

or "Mr. Brown"), on behalf of himself and a class of similarly situated individuals, seeks relief

for Defendants' violation of his rights, privileges, and immunities secured by 42 U.S.C. §1983,

42 U.S.C. §1981, 42 U.S.C. §1982, the Fourth and Fourteenth Amendments to the United States

1

Constitution, and the Constitution and laws of the State of New York.

2. Specifically, in a practice that has been widely referred to as "Shop and Frisk," Defendants herein have implemented and are continuing to enforce, encourage and sanction policies, practices and/or customs that result in a pattern and practice of unconstitutional stops, searches, seizures, questioning, and false arrests of innocent individuals of color who shop in so-called "high-end" department and retail stores in the City and are suspected of having engaged in shoplifting, credit card fraud, and other acts of larceny within these stores by the NYPD merely because of the color of their skin.

3. This pattern and practice of unconstitutional stops, searches, seizures, questioning, and false arrests of innocent individuals who shop in "high-end" department and retail stores in the City and are suspected of engaging in shoplifting, credit card fraud, or other acts of larceny by NYPD officers often has used, and continue to use, race and/or national origin, not reasonable suspicion or probable cause, as the determinative factors in deciding to stop, search, seize, question, and arrest, in violation of the Equal Protection Clause of the Fourteenth Amendment. The victims of such racial and/or national origin profiling are principally Black, Hispanic and Asian.

4. The NYPD implements and applies these policies, practices and customs in an intentionally discriminatory and race-based manner by focusing suspicion on shoppers of color, particularly on Black, Hispanic and Asian shoppers, who are racially profiled as likely to have engaged in shoplifting, credit card fraud, or other acts of larceny when they shop at and make purchases at "high-end" department and retail stores.

5. The NYPD's widespread constitutional abuses have flourished as a result of, and are directly and proximately caused by, policies, practices and/or customs devised, implemented

and enforced by the City, NYPD, and through input from numerous "high-end" department and retail stores such as Macy's, Bloomingdales and Barneys New York. The City, NYPD and "high-end" department and retail stores have acted with deliberate indifference to the constitutional rights of those who would come into contact with NYPD officers by: (a) failing to properly screen, train, and supervise NYPD officers, (b) inadequately monitoring NYPD officers and their practices related to retail store-related crime enforcement, (c) failing to sufficiently discipline NYPD officers who engage in constitutional abuses, and (d) encouraging, sanctioning and failing to rectify the NYPD's unconstitutional practices.

6.     Further, the NYPD has a policy, practice and/or custom whereby when police officers are tipped off or called by security personnel at these "high-end" department or retail stores to arrest and detain individuals who are suspected of or have already been detained by these store personnel for shoplifting, credit card fraud, or other acts of larceny, the responding officers do not inquire into the factual basis for arrests and detentions or whether there are objective facts which could establish probable cause to arrest the individual. Rather, the NYPD has a policy, practice and/or custom of relying on the legal conclusions made by the store's security personnel, who lack any proper training and who frequently target customers based on the color of their skin.

7.     As such, there is a policy, practice and/or custom within the NYPD wherein NYPD officers arrest individuals for shoplifting, credit card fraud, and other acts of larceny committed inside "high-end" department or retail stores without first determining whether there is probable cause to arrest the individual.

8.     The City and the NYPD are deliberately indifferent to the fact that NYPD officers rely upon legal conclusions of store security personnel in "high-end" department or retail stores

where customers are accused or suspected of shoplifting, credit card fraud, or other acts of larceny, rather than inquire into whether there are facts known to the security officer which establish that probable cause to arrest the customer exists.

9.    As a result of the City's deliberate indifference about the fact that NYPD officers routinely arrest customers of "high-end" department or retail stores who are accused or suspected of shoplifting, credit card fraud, or other acts of larceny by store personnel without knowing whether they actually have probable cause to arrest the individual, there is a policy, practice and/or custom of NYPD officers arresting individuals suspected or accused of shoplifting, credit card fraud or other acts of larceny without probable cause.

10.    As a direct and proximate result of Defendants' policies, practices and/or customs, hundreds of innocent City residents, in particular Black, Hispanic and Asian individuals, have been subjected to unconstitutional stops, searches, seizures, questioning, and false arrests by NYPD officers.

11.    As a direct and proximate result of Defendants' policies, practices and/or customs, hundreds of innocent Black, Hispanic, Asian and other non-White individuals, who have been subjected to false arrests and in turn, with having to defend against baseless criminal prosecutions, find themselves in situations where their livelihoods, reputations and futures are at risk because of the criminal charges they face.  Such individuals are often unable to afford private attorneys and/or take the time off from work or school needed to adequately fight against such malicious and baseless prosecutions all the way through an acquittal at trial.  Unless these cases are dismissed either voluntarily by the state or by the court, this inability to afford to obtain an acquittal often leaves such persons with little choice but to either plead guilty to crimes they did not commit, or accept offers of Adjournments in Contemplation of Dismissal, also known as

an ACD.  However, pleading guilty to crimes, even those that one may be innocent of, nonetheless causes one to have a permanent criminal record, which can have debilitating effects on one's future and ability to earn a living.  Even an ACD, which technically nullifies an arrest by ultimately dismissing it so long as a defendant subsequently stays out of trouble for a period of time, can still have highly detrimental effects to one's livelihood, as accepting an ACD will, among other things, prevent a person from obtaining a job in the banking industry.  See 12 U.S.C. § 1829 (a)(1).

12.     Plaintiff seeks to represent a certified class for the purpose of obtaining injunctive, declaratory and monetary relief.  Plaintiff seeks a class-wide judgment declaring that the policies, practices and/or customs described herein violate the Fourth and Fourteenth Amendments, a class-wide injunction enjoining Defendants from continuing such policies, practices and/or customs, compensatory and punitive damages for Plaintiff and class members, an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367(a).

14.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## ADMINISTRATIVE REQUIREMENTS

15.     Plaintiff Brown filed a Notice of Claim with the City of New York on July 30, 2013, which was within ninety (90) days from the date Plaintiff's claims accrued.  A hearing pursuant to N.Y. Gen. Mun. Law §50-H was held on October 16, 2013.

16.     This action has been brought within one year and ninety (90) days from the date

Plaintiff's claims accrued.

## PARTIES

17.     Plaintiff Robert L. Brown ("Mr. Brown"), a Black male who resides in Brooklyn, New York, represents a class of innocent Black, Hispanic, Asian and other non-White shoppers at "high-end" department and retail stores, including, but not limited to, Macy's, Bloomingdales and Barneys New York, who have been or are being unlawfully stopped, searched, seized, questioned and/or falsely arrested for shoplifting, credit card fraud and/or other acts of larceny based upon their race, national origin, ethnicity and/or color pursuant to a policy, pattern and practice of racially profiling individuals of color who patronize such stores.

18.     Defendant City is a municipal entity created and authorized under the laws of the State of New York.  It is authorized under the laws of the State of New York to maintain a police department, Defendant NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.  The NYPD's operations include the operations as described herein.

19.     Defendant Devirgilio is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Devirgilio is sued in his individual capacity.

20.     Defendant Droesch is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Droesch is sued in his individual capacity.

21.     Upon information and belief, Defendants John Does #1 through #2, are, and/or were, at all times relevant herein, officers, employees and agents of the NYPD, a municipal

agency of the City.  John Does #1 through #2 are sued in their individual capacities.

22.     At all times relevant herein, Defendants Devirgilio, Droesch and John Does #1 through #2 have acted under color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City and/or the NYPD in engaging in the conduct described herein.  At all times relevant herein, said Defendants have acted for and on behalf of the City and/or the NYPD with the power and authority vested in them as officers, agents and employees of the City and/or the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the City and/or the NYPD.

23.     At all times relevant herein, Defendants Devirgilio, Droesch and John Does #1 through #2 have violated clearly established constitutional standards under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of which a reasonable person would have known.

## CLASS ACTION ALLEGATIONS

24.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff seeks to represent a certified Plaintiff class consisting of all innocent Black, Hispanic, Asian and non-White persons who have been or will be subjected by NYPD officers to Defendants' policy, practice and/or custom of stopping, searching, seizing, questioning, and falsely arresting while or after shopping in "high-end" department or retail stores in the City for engaging in shoplifting, credit card fraud, or other acts of larceny by NYPD officers in the absence of a reasonable, articulable suspicion that criminal activity is taking place and/or probable cause, in violation of their constitutional and common law rights, during the fullest period permitted by the applicable statute of limitations.

25.     The members of the class are so numerous as to render joinder impracticable. Upon information and belief, hundreds of people have been and continue to be stopped,

searched, seized, questioned and/or falsely arrested each year by the NYPD in connection with suspected shoplifting, credit cards fraud, or other acts of larceny while or after shopping in "high-end" department or retail stores, without reasonable, articulable suspicion of criminal conduct and/or probable cause, during the fullest period permitted by the applicable statute of limitations.

26.     In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court.  Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  Moreover, many class members who have been victimized by the NYPD's unconstitutional practices do not bring individual claims for fear of retaliation and reprisals by NYPD officers.  There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

27.     The class members share a number of questions of law and fact in common, including, but not limited to:

(a)     whether the NYPD engages in a policy, practice and/or custom of stopping, searching, seizing and/or falsely arresting members of the class in the absence of reasonable, articulable suspicion of criminal conduct and/or probable cause required;

(b)     whether the NYPD has a discriminatory policy, practice, and/or custom of unconstitutional stops, searches, seizures, questioning and/or false arrests of individuals who shop in "high-end" department or retail stores for suspected shoplifting, credit card fraud, and other acts of larceny, that is motivated by the class members' race, ethnicity, and/or national origin;

(c)     whether the NYPD engages in profiling on the basis of race and/or national origin in targeting class members for such stops, searches, seizures, questionings and/or

arrests in violation of the Equal Protection Clause of the Fourteenth Amendment;

(d)     whether the City has failed to adequately and properly screen, train, supervise, monitor and discipline NYPD officers, and whether those failures have caused the constitutional violations inflicted by NYPD officers against class members; and

(e)     whether the City has sanctioned and failed to rectify unconstitutional stops, searches, seizures, questionings and/or false arrests by members of the NYPD, and whether such acts and omissions have caused constitutional violations by NYPD officers against class members.

28.     Plaintiff's claims are typical of those of the class.  Like the other members of the class, Plaintiff has been a victim of the NYPD's policy, practice and/or custom of unlawfully stopping, searching, seizing, questioning and/or falsely arresting of Black, Hispanic, Asian and non-White shoppers in "high-end" department or retail stores for suspected shoplifting, credit card fraud or other acts of larceny while shopping.

29.     The legal theories under which Plaintiff seeks declaratory, injunctive and monetary relief are the same or similar to those on which all members of the class will rely, and the harms suffered by Plaintiff are typical of the harms suffered by the class members.

30.     Plaintiff has a strong personal interest in the outcome of this action, has no conflict of interest with members of the Plaintiff class, and will fairly and adequately protect the interests of the class.  Plaintiff is a Black male who shops in "high-end" department or retail stores in New York City.  As long as the NYPD engages in its policy, practice and/or custom of unlawfully stopping, searching, seizing, questioning and arresting individuals of color who shop at "high-end" department or retail stores in connection with suspected shoplifting, credit card fraud and other acts of larceny, Plaintiff is, and will remain, at high risk of being illegally

stopped, searched, seized, questioned and arrested again by the NYPD.

31.     Plaintiff is represented by experienced civil rights counsel who have litigated a wide range of class action lawsuits, have the resources, expertise and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

32.     The Plaintiff class should be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory, injunctive and monetary relief appropriate.

33.     As a proximate result of the actions of Defendants, their agents, and their employees, as described herein, class members have suffered and continue to suffer irreparable loss and injury, including but not limited to economic loss, mental anguish, emotional pain and suffering, humiliation, embarrassment, physical and emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life, loss of income, loss of job opportunities, interference with life's daily activities and a deprivation of their civil rights.  For these injuries, members of the class will be seeking compensatory damages to the fullest extent permitted under the law.

34.     Because Defendants acted knowingly, intentionally, maliciously and/or with willful, wanton and reckless disregard for the class members and/or their federally protected rights, members of the Class also will be seeking punitive damages.

## STATEMENT OF FACTS

**I.     Robert Brown**

35.     The class is represented by Plaintiff Robert Brown ("Mr. Brown"), who was wrongfully targeted for suspicion of credit card fraud based on his race (African-American)

and/or color (Black), and subjected to civil rights violations, discrimination and other unlawful conduct at Macy's flagship store at Herald Square, New York, the self-proclaimed "Largest Department Store in the World."

36.     On June 8, 2013 at about 3:00 p.m., Mr. Brown entered the Macy's "flagship" store located at Herald Square in Manhattan to purchase a present for his mother.

37.     After browsing a few designer wrist watches, Mr. Brown decided to purchase a watch which cost approximately thirteen hundred dollars ($1,300.00).

38.     As Mr. Brown waited for the watch to be prepared for purchasing, he decided to browse for a pair of sunglasses, and made his way over to a display of sunglasses.

39.     Soon thereafter, Mr. Brown decided to purchase a pair of sunglasses that cost approximately three hundred and fifty dollars ($350.00).

40.     As the Macy's employee prepared the pair of sunglasses for purchase, Mr. Brown made his way back to the watch counter to complete his purchase of the wrist watch he had chosen for his mother.

41.     Mr. Brown proceeded to hand over his American Express credit card to the cashier at the watch counter, who completed the transaction without incident.

42.     Mr. Brown then made his way back to the sunglass counter to complete the purchase of the pair of sunglasses, holding his American Express credit card in his hand so that the purchase could be completed.

43.     However, Mr. Brown was unable to complete his desired purchase, as he was suddenly confronted by Defendant Droesch and John Does #1 and #2, who immediately accused him of using a fake credit card.  Within seconds, the men grabbed Mr. Brown's arms and placed him into handcuffs.

44.     Mr. Brown pleaded with these men that his credit card was not a fake, and could easily be verified by cross-referencing the name on the credit card with the identification he had on his person.

45.     However, said Defendants refused to listen to Mr. Brown, and instead began to forcefully parade him through the store like an already convicted common criminal.  Mr. Brown asked the officers why he was being arrested, but they refused to provide any legitimate reason for the arrest.

46.     Mr. Brown was then led to a room within the store containing a number of holding cells enclosed by metal bars, all of which were occupied by individuals of color.

47.     Mr. Brown was then placed into one of these holding cells, and told to remove his belt, wallet, and a backpack he had on, and also had his cell phone confiscated.  Defendants Droesch and John Does #1 and #2 proceeded to search through Mr. Brown's possessions.

48.     By this time, Defendant Devirgilio had joined the other three officers.  Although said Defendants came across Mr. Brown's passport, New York driver's license, as well as his Louisiana residency card, all of which matched the name on the American Express card that Defendants vehemently accused Mr. Brown of being a fake, Defendants continued to accuse Mr. Brown of engaging in credit card fraud, convinced that a Black person like Mr. Brown could not legitimately afford such an expensive item as the watch he purchased.

49.     After much time had elapsed during this confinement, Mr. Brown was asked to identify himself.  Mr. Brown proceeded to inform Defendants that he was an actor, and had appeared in numerous films and television shows.  Hearing this appeared to jar Defendants, who apparently realized that they had falsely arrested, accused and imprisoned someone who would

have both the means and notoriety to hold them accountable for their discriminatory and unlawful conduct.

50.    As it became readily apparent that Mr. Brown was not just innocent, but that he was also a notable actor, Mr. Brown was finally released by Defendants.  Defendant Devirgilio, in an attempt to curry favor with Mr. Brown, even gave Mr. Brown a ride in a police vehicle to his mother's graduation ceremony.

51.    The arrest report regarding this incident issued by Defendants would state that Defendant Droesch had purportedly been informed that Mr. Brown was using a possible fraudulent credit card, but that after further investigation, the credit card was found to be real, and the arrest was voided.

52.    As such, Defendants' own words demonstrate the lack of justification for stopping, searching, seizing, questioning, and particularly handcuffing, parading and arresting Mr. Brown by Defendants.  Rather, Mr. Brown's race and/or national origin, and the fact that he was purchasing expensive items in a "high-end" department or retail served as the basis for Defendants' unlawful conduct against him.

53.    The conduct engaged in, authorized, directed, acquiesced in and/or ratified by Defendants and their employees and agents, as described above, denied Mr. Brown, on the basis of his race, national origin, ethnicity and/or color, the right to make and enforce contracts, including the right to enjoy all of the benefits, privileges, terms and conditions of a contractual relationship as is available to white citizens, denied him the full and equal benefits of all laws and proceedings for the security of persons and property as enjoyed by White citizens, denied him the same right enjoyed by White citizens to hold property afforded to him under federal civil

rights laws; and conspired to deprive him of the equal protection and/or equal privileges and immunities of the laws as are enjoyed by White citizens.

54.     Through the actions described above, Defendants acted knowingly, intentionally, maliciously, and/or with willful, wanton and reckless disregard for Mr. Brown' federally and state protected civil rights.

55.     Defendants' actions, as described above, constitute a continuing violation and have been an ongoing pattern and practice of unlawful conduct.  Defendants knew or should have known that their actions, as described above, were in violation of law.

56.     As a proximate result of the actions of Defendants, their agents and employees, as described above, Mr. Brown has suffered and continues to suffer irreparable loss and injury, including but not limited to economic loss, mental anguish, emotional pain and suffering, humiliation, embarrassment, physical and emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life, interference with life's daily activities and a deprivation of his civil rights.  For these injuries, Mr. Brown seeks compensatory damages to the fullest extent permitted under the law.

57.     Because Defendants acted knowingly, intentionally, maliciously and/or with willful, wanton and reckless disregard for Mr. Brown and/or his federally protected rights, Mr. Brown also seeks punitive damages.

**II.     Allegations and Evidence of Other Victims of the Pattern and Practice**

58.     Like Mr. Brown, scores of other Black, Hispanic, Asian and non-White customers of "high-end" department or retail stores have been victimized by the NYPD's policies, practices, and/or customs of racially profiling shoppers at these stores for suspected shoplifting, credit card fraud or other acts of larceny and subjecting them to unlawful stops, searched,

seizures, questionings and false arrests.  The accounts of some of these individuals are detailed below.

### A.      *Art Palmer*

59.      As alleged in numerous publically accessible media accounts, on April 24, 2013, Art Palmer, an African-American male, lawfully purchased a number of items from the Macy's Herald Square location totaling in the hundreds of dollars.  After exiting the store, Mr. Palmer was stopped by four police officers several blocks away who suspected him of shoplifting, and proceeded to searched through his shopping bags.  The officers told Mr. Palmer that they stopped him because they purportedly could no longer see him on security cameras.

60.      Upon information and belief, this stop was made based upon information provided by Macy's employees.  However, there was no reasonable suspicion or other legitimate basis for the NYPD officers in question to stop, search, seize or question Mr. Palmer.  Rather, Mr. Palmer was stopped because he was an African-American male who had just exited Macy's with multiple shopping bags full of merchandise.

61.      After all of the merchandise in his shopping bags were accounted, Mr. Palmer was allowed to leave, but not before his constitutional rights had been violated.

### B.      *Trayon Christian*

62.      As alleged in the complaint in the action entitled Trayon Christian v. Barneys New York Inc., The City of New York, et al., No. 159654/2013 (N.Y. Sup. Ct.), filed on October 21, 2013, on the afternoon of April 29, 2013, Trayon Christian, a 19 year old Black male college student, exited the Barneys New York store located on the Upper East Side of Manhattan after lawfully purchasing a $350 belt with his debit card.  After walking several blocks, Mr. Christian was suddenly confronted by undercover NYPD officers, who told him someone at the Barneys

store had raised concerns over his purchase. Specifically, Mr. Christian was accused of making the purchase with a fraudulent and/or unauthorized debit/credit card.

63.     Even though Mr. Christian showed the officers his identification, his debit card, as well as his receipt, the officers nonetheless told him that his identification was false and that a young black man like he could not afford to make such an expensive purchase.

64.     Mr. Christian was then searched, placed into handcuffs and arrested, put into a police car, and driven to the 19th precinct.

65.     There, Mr. Christian was placed in a holding cell for over two hours. Officers at the precinct even asked Mr. Christian how a young Black man such as himself could afford to purchase such an expensive belt. Mr. Christian was ultimately released without any criminal charges filed against him.

**C.     _Kayla Phillips_**

66.     As alleged in numerous publically accessible media reports, on February 28, 2013, Kayla Phillips, a 21 year old Black female nursing student, also went to Barneys New York located on the Upper East Side of Manhattan and lawfully purchased a twenty-five hundred dollar ($2,500) handbag with a debit.

67.     After she exited the store, Ms. Phillips was confronted by undercover NYPD officers several blocks away. One of the detectives, a female Caucasian officer, demanded to know where Ms. Phillips lived. When Ms. Phillips told the officers that she lived in Brooklyn, the female Caucasian officer responded, "What are you doing here?"

68.     The officers proceeded to demand to know how Ms. Phillips was able to purchase the bag, and accused her of using a fraudulent debit card. The officers eventually released Ms.

Phillips after she was able to showed them the receipt, the debit card she used and her identification.

### D.    *Abeer Almaalouf*

69.    As alleged in the complaint in the action entitled <u>Abeer Almaalouf, et al. v.</u> <u>Federated Department Stores, Inc., at al.</u>, 115826/2008 (N.Y. Sup. Ct.), filed on November 20, 2008, on the evening of December 20, 2007, Abeer Almaalouf, an adult female of Syrian descent, went to Macy's' Herald Square location.  While waiting in line at the in-store McDonald's restaurant, was suddenly confronted by Macy's security personnel who immediately confiscated Ms. Almaalouf's belongings, accused her of shoplifting, and physically forced her into a holding cell located in the store, where she was held for three hours.

70.    Thereafter, despite finding no evidence of any shoplifting or other criminal activity, NYPD police officers, at the direction of Macy's security personnel, arrested Ms. Almaalouf and charged her with petit larceny and possession of stolen property.

### E.    *Assetou Toure*

71.    As alleged in the Complaint in the action entitled <u>Assetou Toure v. The City of</u> <u>New York, et al.</u>, 11-cv-01122 (DAB) (S.D.N.Y.), filed February 18, 2011, on the evening of June 3, 2008, Assetou Toure, a Black female, was shopping in Macy's' Herald Square location when she was suddenly confronted by Macy's security personnel and pushed into an elevator. She was then brought to a room containing holding cells, placed inside one of the cells and accused of shoplifting.

72.    Macy's security personnel then seized her belongings, including her money, cell phone, and diabetes medication, and refused to tell her why she was being detained.  Ms. Toure

at one point became unconscious as a result of a drop in her blood sugar level due to her apprehension and fear.

73.     After being treated by paramedics, Macy's personnel turned Ms. Toure over to police officers who, rather than investigate whether there was any probable cause to arrest Ms. Toure, refused to listen to Ms. Toure when she tried to speak to them and told her to "shut the f*** up," and that they "were here for Macy's—not for her."

74.     Over the next two years, Ms. Toure fought against the baseless criminal charges levied against her, ultimately obtaining a dismissal of her case.

### F.     *Ayla Gursoy*

75.     As alleged in the complaint in the action entitled <u>Ayla Gursoy v. Macy's Inc., et al.</u>, No. 110665/2011 (N.Y. Sup. Ct.), filed September 19, 2011, on the afternoon of September 18, 2010, Ayla Gursoy, a female of Turkish descent, was shopping in Macy's' Herald Square location when she was suddenly approached by Macy's security personnel and falsely accused of theft. Ms. Gursoy was then forced into the store's basement, where she was ordered to pay five hundred dollars ($500) to secure her release.

76.     After Ms. Gursoy' refused, she was detained by Macy's security personnel for over four hours, until she was handed over to NYPD police officers. The officers did not independently investigate the situation, and relied solely upon the word of Macy's security personnel to handcuff and arrest Ms. Gursoy. Ms. Gursoy was later charged with petit larceny and criminal possession of stolen property. Although Ms. Gursoy was offered the option of accepting an Adjournment in Contemplation of Dismissal ("ACD") by the prosecution, Ms. Gursoy refused the ACD, and instead demanded to have a trial on the merits. The criminal case against Ms. Gursoy was ultimately dismissed almost a year later.

G.     **_Rene Hughes_**

77.     As alleged in the complaint in the action entitled Rene Hughes v. Macy's East, LLC, City of New York, et al., 09-cv-04710 (JGK) (S.D.N.Y.), filed January 11, 2010, on May 24, 2008, Rene Hughes, an African-American woman, exited Macy's' Herald Square location and attempted to enter a subway station.  She was then suddenly stopped and arrested by an NYPD police officer who brought her back into the store.

78.     Ms. Hughes was then falsely accused of shoplifting and subjected to a search. Macy's personnel and the NYPD officer both also attempted to coerce Ms. Hughes into signing an agreement never to return to the store.

79.     Upon realizing that there were no stolen items in Ms. Hughes' possession, she was released with any charges .

H.     **_Carmen Caba and Marlene Anthony_**

80.     As alleged in the complaint in the action entitled Carmen Caba and Marlene Anthony v. The City of New York, et al., 12-cv-02381 (KAM) (JMA) (E.D.N.Y.), filed May 14, 2012, on the evening of May 14, 2011, Carmen Caba and Marlene Anthony, two Hispanic women, were shopping at a Macy's store in Brooklyn, New York.  After purchasing approximately thirteen hundred dollars ($1300) in merchandise, Ms. Anthony and Ms. Caba were suddenly approached by eight Macy's security personnel who falsely accused them of shoplifting, and proceeded to detain them.

81.     Although Ms. Caba and Ms. Anthony were able to produce receipts that confirmed that their purchases were legal, Macy's security personnel nonetheless had NYPD police officers come and arrest the two women, despite failing to conduct any independent

investigation nor have any probable cause to continue to detain.  The NYPD officers instead simply relied on the information provided to them by the Macy's personnel.

82.     The charges brought against Ms. Caba and Ms. Anthony were eventually dismissed a year later.

**III.    The NYPD's Pattern of Violating the Constitutional Rights of Individuals of Color Who Shop at "High-End" Department or Retail Stores is a Direct and Proximate Result of Defendants' Policies, Practices and/or Customs**

83.     The Fourth Amendment prohibits police officers from conducting stops without a reasonable, articulable suspicion of criminal conduct and searching, seizing or arresting persons without probable cause.

84.     Additionally, the Equal Protection Clause of the Fourteenth Amendment bars police officers from targeting individuals for stops on the basis of race or national origin.

85.     The pervasive unconstitutional practices of the NYPD detailed herein are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City, with the knowledge that such policies, practices and/or customs would lead to violations of the Fourth and Fourteenth Amendments.  Those policies, practices and/or customs include: (a) failing to properly screen, train and supervise NYPD officers, (b) failing to adequately monitor and discipline NYPD officers, and (c) encouraging, sanctioning and failing to rectify the NYPD's custom and practice of unlawful stops, searches, seizures and arrests.

*A.     Failure to Properly Screen, Train and Supervise NYPD Officers*

86.     Although fully aware that the work of the NYPD demands extensive training, superior judgment and close supervision, the City failed to properly screen, train and supervise NYPD officers, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

87.     Upon information and belief, Defendants have failed to properly train and supervise NYPD officers, including supervisors, concerning the legal and factual bases for conducting stops, searches, seizure and/or attests that comply with the Fourth and Fourteenth Amendments in an effective manner.

88.     The inadequate screening, training and supervision of the NYPD is a direct and proximate cause of the NYPD's rampant unconstitutional stops, searches, seizures and/or arrests. As a direct and proximate result of the Defendants' failure to screen, train and supervise NYPD officers, thousands of people of color have been subjected to unlawful stops, searches, seizures and/or false arrests in connection with suspected shoplifting, credit card fraud, or other acts of larceny taking place inside "high-end" department or retail stores simply because of their race and/or national origin.  By failing to properly screen, train and supervise NYPD officers, the City has acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

**B.     _Failure to Monitor and Discipline NYPD Officers_**

89.     The NYPD's widespread abuses are also a direct and proximate result of the failure of the City to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers who engage in, encourage or conceal unconstitutional practices. Among other things, the City has knowingly, deliberately and recklessly failed:

> (a)     to take appropriate disciplinary action and corrective measures against NYPD officers who have engaged in suspicionless stops;

> (b)     to conduct adequate auditing to determine if the stop conducted by NYPD officers comply with the NYPD's written policy prohibiting stops that are not based upon reasonable suspicion and use race and/or national origin as the determinative factor in initiating police action;

> (c)     to take sufficient corrective and remedial action against NYPD officers who provide fabricated, false, or impermissible justifications for stops; and

21

     (d)     to take sufficient corrective, disciplinary and remedial action to combat the so-called "blue wall of silence," wherein NYPD officers regularly conceal or fail to report police misconduct.

90.     The City failed to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations. By such acts and omissions, the City has acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

## FIRST CLAIM
### (Violation of 42 U.S.C. §1983 - Fourth Amendment)

91.     Plaintiff repeats and re-alleges paragraphs 1 through 90 above as if fully set forth herein.

92.     Defendants have implemented, enforced, encouraged and sanctioned a policy, practice and/or custom of stopping, searching, seizing and arresting Plaintiff and members of the Plaintiff class without the reasonable articulable suspicion of criminality or probable cause required by the Fourth Amendment.

93.     The NYPD's constitutional abuses and violations were, and are, directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by the City, including: (a) the failure to adequately and properly screen, train, and supervise NYPD officers, and (b) the failure to properly and adequately monitor and discipline NYPD officers.

94.     Defendants have acted with deliberate indifference to the Fourth Amendment rights of Plaintiff and other members of the class.  As a direct and proximate result of the acts and omissions of Defendants, the Fourth Amendment rights of Plaintiff and other class members have been violated.   By acting under color of state law to deprive Plaintiff and other class

members of their rights under the Fourth Amendment, Defendants are in violation of 42 U.S.C. §
1983, which prohibits the deprivation under color of state law of rights secured under the United
States Constitution.

95.     The NYPD targets Black, Hispanic Asian and other non-White individuals who
shop at "high-end" department or retail stores in New York City for illegal stops, searches,
seizures and arrests.  Thus, a real and immediate threat exists that the Fourth Amendment rights
of Plaintiff and other class members will be violated by NYPD officers in the future.  Moreover,
because Defendants' policies, practices and/or customs subject Plaintiff and other class members
to stops, searches, seizures and arrests without any reasonable, articulable suspicion of
criminality or probable cause, but rather on the basis of race and/or national origin, Plaintiff and
other class members cannot alter their behavior to avoid future violations of their constitutional
and civil rights at the hands of the NYPD.

96.     Plaintiff and other members of the class will suffer serious and irreparable harm
to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy,
practice and/or custom of unconstitutional stops, searches, seizures and arrests, and the policies,
practices and/or customs that have directly and proximately caused such constitutional abuses.

### SECOND CLAIM
#### (Violations of 42 U.S.C. § 1983 - Equal Protection Clause)

97.     Plaintiff repeats and re-alleges paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants have implemented and enforced a policy, practice and/or custom of
stopping, searching, seizing and arresting Plaintiff and members of the Plaintiff class without the
reasonable, articulable suspicion of criminality and/or probable cause required by the Fourth
Amendment, and based solely on their race and/or national origin.  These unconstitutional stops,
searches, seizures and arrests have and are being conducted predominantly on Black, Hispanic,

Asian and other non-White individuals who shop at "high-end" department and retail stores on the basis of racial and/or national origin profiling. As a result, the NYPD's policy, practice and/or custom of unlawful stops searches, seizures and arrests violate the Equal Protection Clause of the Fourteenth Amendment. The NYPD's constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City, including: (a) the failure to adequately and properly screen, train, and supervise NYPD officers, and (b) the failure to adequately and properly monitor and discipline the NYPD and its officers.

99.     Defendants have acted with deliberate indifference to the Fourteenth Amendment rights of Plaintiff and class members. As a direct and proximate result of the aforesaid acts and omissions of Defendants, the Fourteenth Amendment rights of Plaintiff and class members have been violated. By their acts and omissions, Defendants have acted under color of state law to deprive Plaintiff and class members of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

100.    Due to the NYPD's targeting of Black, Hispanic, Asian and other non-White persons for suspected shoplifting, credit card fraud, and other acts of larceny committed inside "high-end" department and retail stores in which Plaintiff and other class members shop, a real and immediate threat exists that the Fourteenth Amendment rights of Plaintiff and other class members will be violated by NYPD officers in the future. Moreover, because Defendants' policies, practices and/or customs subject Plaintiff and other class members to repeated stops, searches, seizures and arrests without any reasonable, articulable suspicion of criminality and/or probable cause, but on the basis of race and/or national origin, Plaintiff and other class members

cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD.

101.     Plaintiff and other class members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice and/or custom of unconstitutional race and/or national origin-based stops, searches, seizures and arrests, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

## THIRD CLAIM
**(Plaintiff Brown's Claims Pursuant to 42 U.S.C. §1983 Against Defendants Devirgilio, Droesch and John Does #1 through #2)**

102.     Plaintiff repeats and re-alleges paragraphs 1 through 101 as if fully set forth herein.

103.     The conduct of Defendants Devirgilio, Droesch and John Does #1 through #2 in stopping, searching, seizing and falsely arresting Plaintiff Brown on June 8, 2013 were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds.  Moreover, this stop, search, seizure, detention and arrest was performed on the basis of racial and/or national origin profiling.

104.     As a direct and proximate result of such acts, Defendants Devirgilio, Droesch and John Does #1 through #2 deprived Plaintiff Brown of his Fourth and Fourteenth Amendment rights in violation of  42 U.S.C. § 1983.

105.     As a direct and proximate result of those constitutional abuses, Plaintiff Brown has suffered, and will continue to suffer, physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

106.    The acts of Devirgilio, Droesch and John Does #1 through #2 were intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiff Brown to an award of punitive damages.

## FOURTH CLAIM
### (Violations of 42 U.S.C. §1981)

107.    Plaintiff repeats and re-alleges paragraphs 1 through 106 as if fully set forth herein.

108.    By the actions described above, Defendants have continually denied Plaintiff and the members of the Plaintiff class, the same right to make and enforce contracts as is enjoyed by White citizens of the United States, in violation of 42 U.S.C. § 1981.  Plaintiff has been denied the enjoyment of the benefits, privileges, terms and conditions of his contractual relation with Macy's due to Defendants' discriminatory and unlawful policies, practices and/or customs.

109.    By the actions described above, Defendants have also denied Plaintiff and the members of the Plaintiff class, the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens.

110.    By the actions described above, Defendants have engaged in and continue to engage in a policy, pattern and practice of discrimination against Black, Hispanic, Asian and other non-White shoppers at "high-end" department or retail stores in New York City due to their race in violation of 42 U.S.C. §§ 1981 and 1983.

111.    The past and continuing acts and conduct of Defendants described above were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of Plaintiff and the member of the Plaintiff class.

## FIFTH CLAIM
### (Violations of 42 U.S.C. Section 1982)

112.     Plaintiff repeats and re-alleges paragraphs 1 through 111 as if fully set forth herein.

113.     By the actions described above, among others, Defendants have denied Plaintiff and members of the Plaintiff class, on the basis of their race, national origin, ethnicity and/or color, the same right to hold personal property as is enjoyed by White citizens of the United States, in violation of 42 U.S.C. § 1982.

## SIXTH CLAIM
### (Violations of Rights Under New York Law)

114.     Plaintiff repeats and re-alleges paragraphs I through 113 as if fully set forth herein.

115.     By the actions described above, Defendants, jointly and severally, have committed the following wrongful acts against Plaintiff and other class members, which are tortious under the Constitution and laws of the State of New York:

   a)     assault and battery;

   b)     false imprisonment/false arrest;

   c)     negligence; and

   d)     violation of rights otherwise guaranteed under the Constitution and the laws of the State of New York.

116.     In addition, Defendant City was negligent in their hiring, screening, training, supervision and retention of Defendants Devirgilio, Droesch and John Does #1 through #2.

117.   The foregoing acts and conduct of Defendants were a direct and proximate cause of injury and damage to Plaintiff and other class members and violated the statutory and common law rights as guaranteed to them by the Constitution and laws of the State of New York.

### SEVENTH CLAIM
**(Respondent Superior Claim Against the City Under New York Common Law)**

118.   Plaintiff repeats and re-alleges paragraphs 1 through 117 as if fully set forth herein.

119.   The conduct of Defendants Devirgilio, Droesch and John Does #1 through #2 occurred while they were on duty, in and during the course and scope of their duties and functions as New York City police officers, and while they were acting as agents and employees of Defendant City.  As a result, Defendant City is liable to Plaintiff under the doctrine of respondent superior.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff and members of the class pray that the Court will:

(a)   Issue an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiff as class representative;

(b)   Issue a class-wide judgment declaring that the NYPD's policy, practice and/or custom of unlawful stops, searches, seizures and arrests concerning suspected shoplifting, credit card fraud and other acts of larceny committed inside "high-end" department and retail stores within New York City challenged herein is unconstitutional in that it violates the Fourth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York, and that its implementation, enforcement and sanctioning by NYPD officers is a direct and proximate result of the following

policies, practices and /or customs of the City:

(i)    failing to adequately screen, train and supervise officers; and

(ii)   failing to adequately monitor the NYPD and its officers and discipline those NYPD officers who violate the constitutional rights of residents of the communities they patrol.

(c)    Issue an order for the following injunctive relief:

(i)    enjoining the NYPD from continuing its policy, practice and/or custom of unlawful stops, searches, seizures and arrests concerning suspected shoplifting, credit card fraud, and other acts of larceny committed inside "high-end" department and retail stores in New York City;

(ii)   enjoining the NYPD from continuing its policy, practice and/or custom of conducting stops, searches, seizures and arrests concerning suspected shoplifting, credit card fraud, and other acts of larceny committed inside "high-end" department and retail stores in New York City based on racial and/or national origin profiling;

(iii)  requiring the City to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the NYPD's policy, practice and/or custom of unlawful stops, searches, seizures and arrests concerning suspected shoplifting, credit card fraud, and other acts of larceny committed inside "high-end" department and retail stores in New York City; and

(iv)   requiring the City to deploy NYPD officers with appropriate and adequate

supervision.

(d)    Award Plaintiff Brown and the members of the class compensatory and punitive damages in amounts that are fair, just and reasonable, to be determined at trial;

(e)    Award Plaintiff and the members of the class reasonable attorneys' fees;

(f)    Award Plaintiff and the members of the class reasonable costs of suit; and

(g)    Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages.

New York, New York
Dated November 13, 2013

Respectfully Submitted,

THOMPSON WIGDOR LLP

Douglas H. Wigdor
Tanvir H. Rahman
85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
dwigdor@thompsonwigdor.com
trahman@thompsonwigdor.com


ELEFTERAKIS ELEFTERAKIS & PANEK

John Elefterakis
Nicholas Elefterakis
111 John Street, Suite 1100
New York, New York 10038
Tel: (212) 532-1116
john@elefterakislaw.com
nick@elefterakislaw.com

*Attorneys for Plaintiff and the Proposed Class*